**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KEITH HOOPER,** | : | |
| **Plaintiff** | : | **No. 16-cv-00123** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **SAFETY-KLEEN** | : | |
| **SYSTEMS, INC., et al.,** | : | |
| **Defendants** | : | |

## MEMORANDUM

Before the Court are Defendants Safety-Kleen Systems, Inc. and Clean Harbors, Inc.'s motions for summary judgment. (Doc. Nos. 153, 155.) For the reasons explained herein, the Court will deny the motions.

## I. BACKGROUND

### A. Procedural Background

On January 8, 2016, Plaintiff Keith Hooper ("Plaintiff"), filed an amended complaint in the Court of Common Pleas of Allegheny County, Pennsylvania, asserting negligence claims against Defendants Safety-Kleen Systems, Inc. ("SK"), and Clean Harbors, Inc. ("CHI"). (Doc. No. 1-2.) CHI subsequently filed a notice of removal with this Court on January 29, 2016. (Doc. No. 1.) On the same date, Defendants filed answers to the amended complaint (Doc. Nos. 3, 4), and CHI filed an amended answer to the amended complaint on February 8, 2016 (Doc. No. 11). On February 24, 2016, CHI filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) (Doc. No. 17), along with a brief in support (Doc. No. 18). Plaintiff then filed a second amended complaint against both SK and CHI on February 24, 2016 (Doc. No. 20), rendering CHI's Rule 12(b)(2) motion moot (Doc. Nos. 17, 21).

Following an unsuccessful mediation (Doc. No. 23), SK filed an answer to Plaintiff's second amended complaint on March 10, 2016 (Doc. No. 27), and on June 27, 2016, CHI filed a motion to dismiss the second amended complaint for lack of personal jurisdiction, which the Court denied on December 13, 2016 (Doc. No. 76). Accordingly, CHI filed an answer to the second amended complaint on January 6, 2017. (Doc. No. 81.) On September 15, 2017, SK and CHI each filed motions for summary judgment (Doc. Nos. 153, 155), along with supporting briefs (Doc. Nos. 154, 156), to which Plaintiff filed briefs in opposition (Doc. Nos. 163, 164). Additionally, SK and CHI filed briefs in reply (Doc. Nos. 166, 167), and Plaintiff filed sur-reply briefs in response thereto (Doc. Nos. 168, 169). Having been fully briefed, the motions are ripe for disposition.[1]

## B. Factual Background[2]

### i. Undisputed Facts

#### 1. Plaintiff's Employment as a Material Handler and the Incident Giving Rise to the Above-Captioned Action

Plaintiff initiated this action in connection with injuries he sustained in the course of his former employment as a material handler on January 30, 2014, on the premises of a facility

---

[1] The above-captioned action was reassigned to the undersigned on September 28, 2017. (Doc. No. 160.)

[2] Unless otherwise indicated, the following relevant facts of record are derived from Defendants' corrected statement of material facts. (Doc. No. 159.) The Court notes that Defendants initially submitted a concise statement of material facts on September 15, 2017 (Doc. No. 152), and subsequently received permission from the Court to file an amended statement of material facts on September 20, 2017 (Doc. No. 158), which Defendants submitted on the same date (Doc. No. 159). On October 15, 2017, Plaintiff submitted a responsive statement of facts (Doc. No. 165), which the docket indicates was submitted in response to Defendants' original statement of facts (Doc. No. 152), although the substance of Plaintiff's responses indicates that Plaintiff has responded to Defendants' corrected statement of facts (Doc. No. 159).

owned by SK and located in Erie, Pennsylvania.[3]  Plaintiff was employed in this capacity since

August 30, 2012, and Plaintiff accepted such employment approximately four months before SK

was acquired by CHI in December of 2012 (the "acquisition").  (Doc. No. 159 ¶¶ 5, 7.)  Both

CHESI and SK are subsidiaries of CHI, which provides "environmental, energy[,] and industrial

services."  (Doc. No. 145-19 at 9.)

As a material handler, Plaintiff worked in an area of the SK facility referred to as the

"Return and Fill" area (Doc. No. 159 ¶ 1), where he "was tasked with emptying [] dirty solvent

into [a] storage tank, cleaning the tank, and filling it with clean solvent" (id. ¶ 56).  This solvent

"is used in parts cleaners for degreasing metal parts."  (Id. ¶ 59.)  Additionally, Plaintiff

completed other job duties in the course of his work as a material handler, including "taking

inventory, shipping and receiving, handling incoming/outgoing waste, and obtaining and

distributing drums . . . and other non-hazardous waste to trucks for distribution."  (Id. ¶ 55.)  On

January 30, 2014 – the date on which the subject incident ("the incident") occurred – Plaintiff

"was operating an SK drum washer unit when solvent sprayed onto his clothing and in the

direction of an open flame torpedo heater . . . purchased by [his] supervisor, Garry Lanphere,

[the] SK [b]ranch [g]eneral [m]anager."  (Id. ¶ 2.)  The ostensible purpose of using this heater in

the facility was to thaw frozen pipes.  (Id. ¶ 3.)  Plaintiff alleges that consequently, he sustained

serious injuries, including, inter alia: "[f]ull thickness burns to the face, scalp, neck, hands, right

calf and left elbow"; "[b]urn injuries to the trachea, lungs[,] and related bodily structures"; and

post-traumatic stress disorder.  (Doc. No. 20-1 at 9.)  Following the incident, Plaintiff received

---

[3] (Doc. No. 159 ¶ 72) ("The SK branch where Plaintiff worked in January 2014 was owned by
SK.").  Plaintiff's employment as a material handler ended subsequent to the incident, and the
Erie facility was also closed.  (Id. ¶ 71.)

benefits pursuant to Pennsylvania's workers compensation statute, which were administered and ultimately paid by CHESI.  (Doc. No. 165 ¶ 89.)

## 2. Additional Aspects of Plaintiff's Employment

In the daily course of his job duties, "before and after the acquisition [and] up to the date of the [incident]," Plaintiff completed daily inspection sheets for SK with respect to the Return and Fill area.  (Doc. No. 159 ¶ 29.)  Plaintiff was also "responsible for offloading the SK parts washer route trucks, handling SK drums and spent solvent at the Return & Fill, operating the SK Return & Fill equipment, completing SK's inventory[,] and managing the SK warehouse."  (Id. ¶ 33.)  Plaintiff's responsibilities as to the Return and Fill area pertained "to the servicing of parts washers and handling of solvents from clients, a line of business that is unique to SK branches." (Id. ¶ 50.)  Further, the job description associated with a material handler "was developed by SK and was a job classification unique to SK" (id. ¶ 54), and "the solvent that [Plaintiff] worked with at the SK [b]ranch was an SK solvent that was made, developed[,] and distributed by SK to SK customers" (id. ¶ 62).[4]

Moreover, Plaintiff received an SK employee handbook upon beginning his employment (id. ¶ 35), and used an e-mail address that included the ending "@Safety-Kleen.com," which he "retained . . . until he stopped working after the incident" (id. ¶¶ 36, 38).[5]  Plaintiff's W-2 forms identified SK as his employer "throughout the course of his employment" (id. ¶ 78), and

---

[4] Plaintiff's responsive statement of facts does not appear to provide a response to Paragraph 62 of Defendant's amended statement of facts, and, accordingly, the Court considers this factual assertion to be undisputed.  See L.R. 56(E) ("Alleged material facts set forth in the moving party's [c]oncise [s]tatement of [m]aterial [f]acts . . . will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied . . . .").

[5] Similarly, the parties do not dispute that Plaintiff "never used or set up an e-mail address containing the words 'Clean Harbors,' such as @cleanharbors.com or @chesi.com."  (Doc. No. 159 ¶ 37.)  The parties also agree that Plaintiff "wore a jacket and shirt with the SK logo while working" and that Plaintiff "was not issued, nor did he wear, any clothing with the Clean Harbors logo."  (Id. ¶ 39.)

Plaintiff's "W-2 [form], earnings summary for 2014[,] and 2014 tax return list his employer as SK" (id. ¶ 79). Plaintiff "believes that he remained an SK employee during the six months prior to the accident[,]" at which time "he was receiving access to the Clean Harbors user ID and login numbers, but believes he did not become a 'Clean Harbors' employee until January 1, 2014."[6] (Id. ¶ 85.)

### 3. Relevant Safety Policies and Procedures and Facts Related to the Machinery Involved in the Incident

At the time of the acquisition in December of 2012, "CHESI and SK operated under their own, separate sets of safety-related policies." (Id. ¶ 14.) SK had used specific Branch Operating Guidelines ("BOGs"), and Standard Operating Procedures ("SOPs"), and subsequent to the acquisition, "the BOGs used by the SK [b]ranches remained in effect as written" because "the existing BOGs were fully aligned and in compliance with the harmonized Health & Safety Policies and Procedures."[7] (Id. ¶ 22.) Further, "[n]either CHI nor CHESI completed general safety audits at the SK [b]ranch," or conducted "an inspection focusing on the Return & Fill building or fire safety." (Id. ¶ 31.) Additionally, a Safety Steering Committee was formed in 2013 (id. ¶ 93), and "[t]he job duties and responsibilities of a [m]aterial [h]andler for SK were never discussed at any of the Safety Steering Committing Meetings prior to [the incident]" (id. ¶ 94). As it relates to the use of torpedo heaters, "[t]here are no references in the notes [of the committee meetings], prior to the accident, concerning the use of torpedo heaters at SK [b]ranches, CHESI, or at any of the other operating companies, or regarding safe operations at

---

[6] Although Plaintiff maintains that on January 1, 2014 he became an employee of "Clean Harbors," Plaintiff "could not specify whether he believed he was an employee of 'Clean Harbors, Inc.' or 'Clean Harbors Environmental Services, Inc.'" (Id. ¶ 84.) Beginning in January of 2014, "CHESI administered the payroll for CHESI and SK employees." (Id. ¶ 83.)
[7] Plaintiff so admits, but adds that CHI "reviewed and approved the (BOGs) before their retention." (Id. ¶ 22.)

the Return & Fill facilities." (Id. ¶ 97.) As to the specific heater Plaintiff was using at the time

of the incident, SK, which "has an account history for the purchase of the heaters . . . purchased

the torpedo heater on January 3, 2014." (Id. ¶¶ 74, 75.) Additionally, "SK's design is used for

the drum washer/dumpster [that] Plaintiff used." (Id. ¶ 76.)[8]

### ii.    Disputed Facts[9]

#### 1.    Safety-Related Policies and Procedures

Defendants maintain that during his employment, Plaintiff operated in accordance with

SK's BOGs and SOPs (id. ¶ 9), which Plaintiff denies on the basis that at the time of the

incident, "[a]ll [s]tandards had been withdrawn and replaced by Clean Harbors' Health and

Safety Standards, and all BOGs had been reviewed and either adopted or rejected by Clean

Harbors" following a review of the relevant procedures in November of 2013 (Doc. No. 165

¶ 9).[10] For the same reasons, Plaintiff also disagrees with Defendants' statement that "SK's

operative policies and procedures did not change after the acquisition and continued to govern

operations at SK [b]ranches." (Doc. Nos. 159 ¶ 11, 165 ¶ 11.) Further, as to Defendants'

statement that "[t]here are no such policies, procedures, standards[,] or guidelines implemented

or enforced by CHI" (Doc. No. 159 ¶ 12), Plaintiff states that the aforementioned policies and

procedures are in fact "CHI [p]olicies and [s]tandards" which "do not represent the

---

[8] In addition, subsequent to the incident, SK issued a "[s]afety [a]lert concerning torpedo heater
devices, promulgated its own BOG addressing torpedo heaters, and created a variance request
that SK branches alone could complete for purposes of requesting a variation in the new safety
policy." (Id. ¶ 100.)

[9] The Court notes that that parties dispute several aspects of the factual background of the instant
action. The Court does not deem the specific factual account contained herein to be undisputed,
but, rather, includes it so as to illustrate the disputed facts relevant for disposing of the motions
presently before the Court.

[10] The parties similarly disagree as to whether "SK implements and enforces BOGs and SOPs
that specifically govern the day-to-day operations of the SK [b]ranches and, more specifically,
the job of a [m]aterial [h]andler at SK [b]ranches." (Doc. Nos. 159 ¶ 10, 165 ¶ 10.)

[p]olicies/[s]tandards of any one 'segment' of Clean Harbors['] business," but, rather, "apply to the entire Clean Harbors organization" (Doc. No. 165 ¶ 12).[11]  The parties also disagree as to the manner in which the relevant policies were "harmonized" as a result of the acquisition, with Defendants purporting to state that CHESI's policies were integrated with those of SK (Doc. No. 159 ¶ 19), and Plaintiff denying this statement because the SK "policies and procedures were reviewed and integrated with CHI policies," as opposed to CHESI's policies (Doc. No. 165 ¶ 19).[12]

As it relates to the Safety Steering Committee, Defendant states that this committee was convened by "employees of SK and CHESI" in April of 2013 (Doc. No. 159 ¶ 93), which Plaintiff disputes by stating that "Alan McKim formed the Safety Steering Committee in his capacity as the [c]hairman and CEO of CHI" (Doc. No. 165 ¶ 93).  With regard to the committee's meeting, Defendant states that the meetings "did not focus on SK [b]ranch-level operations, let alone operations at the Erie SK [b]ranch."  (Doc. No. 159 ¶ 96).  Conversely, Plaintiff states that the committee "'concerned itself' with safety, which necessarily involved operations at all subsidiaries, including [SK] branches," citing various safety-related "policies and programs[,] which impacted the specific manner in which workers performed their individual jobs [that] were addressed by the Safety Steering Committee," including, inter alia: a supervisor safety certification course; accident reporting and review system; a "safety incentive

---

[11] Plaintiff denies Defendants statement that "[t]he SK BOGs and CHESI policies and standards were designed for . . . different kinds of health and safety risks" (Doc. No. 159 ¶ 13) (internal quotation marks omitted), for these reasons, as well (Doc. No. 165 ¶ 13).

[12] Regarding the substance of the harmonized policies, the parties dispute whether the policies "deal[t] with the unique SK job of a [m]aterial [h]andler or with fire safety," as Defendants state that the policies did not address these topics (Doc. No. 159 ¶ 21), and Plaintiff maintains that various CHI policies and standards "were applicable, or potentially applicable, to the work being performed by Plaintiff at the time of the subject incident," including, inter alia: a drum and container handling standard; employee safety meetings standard; and a fire protection standard (Doc. No. 165 ¶ 21).

program"; and a program referred to as "The Safety Starts with Me 3-6-5 Campaign." (Doc. No. 165 ¶¶ 95, 96.)[13] Further, while Defendant states that Lanphere and another employee "on occasion, reviewed safety tips and materials from many different sources, including CHESI, with [b]ranch employees at weekly safety meetings held at the SK [b]ranch in Erie" (Doc. No. 159 ¶ 98), Plaintiff asserts that "the Erie branch received directives from the CHI [s]afety [d]epartment to review, discuss at a weekly meeting, and post on-site [a]lerts and [b]ulletins regarding specific safety topics" (Doc. No. 165 ¶ 98).[14] As it pertains to safety alerts – which Defendants describe as "communicat[ing] safety tips and practices, none of which pertain[ed] to [Plaintiff's] operation of the drum washer or torpedo heater" (Doc. No. 159 ¶ 99) – Plaintiff asserts that these alerts "directly pertained to the work [he] was performing at the time of the subject fire," citing the issuance of one such alert approximately one year before the incident that addressed the use of such heaters, but "did not prohibit the use of portable heaters in any areas, including where flammable materials were stored" (Doc. No. 165 ¶ 99). Plaintiff also cites testimony from Lanphere, who "understood that [the alert] did not ban the use of space heaters at the Erie site, and subsequently purchased [three] additional space heaters, including the open flame heater which was present in the Return and Fill [b]uilding at the time of the fire." (Id.)

2.    **Facts Relating to the Heater Used by Plaintiff at the Time of the Incident**

Although the parties agree that prior to the incident, Plaintiff used the subject heater to attempt to thaw frozen pipes in the building in which the Return and Fill area was located,

_____

[13] For these reasons, Plaintiff also denies Defendants' statement that "[o]verseeing requirements for individual jobs was the responsibility of the individual business entities, such as SK." (Id. ¶ 95.)

[14] To that end, Plaintiff maintains that "[s]aid bulletins contained occasional safety 'tips', but also mandatory safety direction [and] work rules and policies" including a "CHI [s]afety [a]lert banning use of all torpedo heaters issued on January 30, 2014." (Doc. No. 165 ¶ 98.)

Defendants state that "[b]efore the incident occurred, [Plaintiff] positioned the open-flame end of the torpedo heater towards the drum washer, which contained combustible solvent" and "[t]he flame from the torpedo heater ignited the solvent and resulted in burn injuries to Plaintiff" (Doc. No. 159 ¶ 3), while Plaintiff asserts "that the kerosene heater was always stored in the building near the center bay door, and was in that location at the time of the subject incident" (Doc. No. 165 ¶ 3). As to why Plaintiff was using this type of heater, Plaintiff states that at the time of the incident, he "was not performing the tasks described in the BOG[,]" but rather, "was attempting to troubleshoot the dumpster and correct frozen plumbing resulting from the lack of a functional heater in the Return & Fill [s]tructure." (Id. ¶ 25.) Although Defendants state that Greg Chiappini ("Chiappini"), "an SK environmental Health & Safety Manager (EHS), trained the [m]aterial [h]andlers at the SK [b]ranch on completing daily inspections of the Return & Fill area – the same area where [Plaintiff] completed daily job duties and where he was injured in the accident" (Doc. No. 159 ¶ 28), Plaintiff states that Chiappini "testified that he gave one OSHA refresher course, and did not give any other training to Plaintiff" (Doc. No. 165 ¶ 28).

### 3. Additional Aspects of Plaintiff's Employment

Defendants assert that "SK provided [Plaintiff] the tools of his job," and that Plaintiff reported to Lanphere on a daily basis. (Doc. No. 159 ¶ 45.) Plaintiff maintains that "[t]o the contrary, after CHI's acquisition of [SK], Plaintiff was directed to order materials and supplies for the branch using the CHESI computer system, which required [a] log-in using a Clean Harbors Employee ID" (Doc. No. 165 ¶ 45), and that although Plaintiff admits that "Lanphere was the [b]ranch [m]anager and Plaintiff reported to him while he worked at the Erie facility," Plaintiff states that he "and his co-workers, including Lanphere, were CHESI employees at the time of the [incident]" (id. ¶ 46.).

#### 4.      SK's and CHI's Business Operations

Defendants aver that "SK's lines of business (parts washing, used oil cleanup, pickup[,] and refining) are different from CHESI's other businesses, or the business of other CHI operating subsidiary companies." (Doc. No. 159 ¶ 49.) Plaintiff asserts, instead, that SK's "business operations are labeled, organized[,] and operated as the 'SK Environment Services' segment of CHI." (Doc. No. 165 ¶ 49.) According to Plaintiff, "CHESI's business includes collecting and accounting for the revenue of subsidiaries including [SK's] branch operations, and administering the payroll, healthcare, employee benefits and human relations services for the workers there." (Id.)[15]

Further, while the parties do not dispute that Plaintiff's daily job responsibilities in the Return and Fill area "were related to the servicing of parts washers and handling of solvents from clients, a line of business that is unique to SK [b]ranches" (Doc. Nos. 159 ¶ 50, 165 ¶ 50), Plaintiff denies that "CHESI locations do not have these Return & Fill operations" (Doc. No. 159 ¶ 51), stating that the Erie facility was a CHESI location at the time of the incident because it was "operated and managed by CHESI, and staffed by CHESI employees" (Doc. No. 165 ¶ 51). Defendant characterizes CHESI as "operat[ing] hazardous waste incinerators and wastewater treatment plants, and also provid[ing] support for field service operations such as oil exploration" (Doc. No. 159 ¶ 52), to which Plaintiff responds by stating that "[w]hile it is conceded that some of these 'legacy' business operations may be conducted under CHESI's name, CHI conducts business through a network of over 120 subsidiaries and it is CHESI that performs the

---

[15] To that end, Plaintiff states that CHESI "handles billing, collections, and accounting functions for [SK]." (Id. ¶ 49.)

administrative and management functions for these numerous subsidiaries, including [SK]"

(Doc. No. 165 ¶ 52).[16]

As it relates to Defendants' roles in the management of employees, Defendants state that

"SK [b]ranch [m]anagers, in consultation with SK executive management, set the compensation

for branch employees, management[,] and non-management." (Doc. No. 159 ¶ 77.)  Plaintiff

denies this statement, stating that, "[t]o the contrary, executive management of [SK] rested with

CHI or with its controlled subsidiary, CHESI." (Doc. No. 165 ¶ 77.)  In addition, Defendants

state that Plaintiff's "earnings statements issued by ADP for each two week pay period between

12/29/13 and 6/28/14 list [SK] on the pay slips" (Doc. No. 159 ¶ 80),[17] while Plaintiff avers that

his "paychecks were issued by CHESI, and contained the Clean Harbors name and logo" (Doc.

No. 165 ¶ 80).[18]  The parties similarly dispute the designation of Plaintiff's employer on the

relevant payroll documents, as Defendants aver that "[p]ayroll for SK was managed by

ADP . . . which has indisputably confirmed that it did not process payroll to [Plaintiff] under the

employer name of CHESI" (Doc. No. 159 ¶ 81), while Plaintiff states that the relevant records

"merely refer to an entity named Safety Kleen US, but do not state that it is an employer" (Doc.

No. 165 ¶ 81) (internal quotation marks omitted).  Further, the parties address "[t]he

identification of Plaintiff as an employee of CHESI on various post-accident [w]orkers'

[c]ompensation claim documents submitted by the [w]orkers' [c]ompensation carrier for CHESI

and SK," with Defendants characterizing such identification as "an administrative error" (Doc.

---

[16] Defendants maintain that "[t]hese activities are separate and distinct from the operations performed by SK" (Doc. No. 159 ¶ 53), which Plaintiff denies (Doc. No. 165 ¶ 53).

[17] ADP is "a third-party payroll provider."  (Doc. No. 154 at 14.)

[18] Plaintiff also states that his "bank records confirm that the payor for his wages changed from [SK] to CHESI with the first payment of wages after January 1, 2014" (id. ¶ 80), and that he "retained possession of his original [e]arnings [s]tatements[,] which are issued by CHESI and contain the Clean Harbors logo" (id.).

No. 159 ¶ 89), and Plaintiff noting that this identification was made "[o]n numerous occasions" after the initial report and stating that "CHESI did not assert that it was inaccurately identified as [Plaintiff's] employer at any point in the disputed proceedings, and a final [o]rder was entered against it for payment of certain accident-related expenses . . . [which] was never appealed" (Doc. No. 165 ¶ 89).

## II.    STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis for allowing a reasonable factfinder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the relevant inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, a court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas. Co., 364 F.3d 135, 145-46 (3d Cir. 2007). Once the moving party has shown that there is an absence of evidence to support the non-moving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Grp. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir.

2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the non-moving party "fails

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden at trial," summary judgment is warranted.

Celotex, 477 US. at 322.  With respect to the sufficiency of the evidence that the non-moving

party must provide, a court should grant a motion for summary judgment when the non-movant's

evidence is merely colorable, conclusory, or speculative.  Anderson, 477 U.S. at 249-50.  There

must be more than a scintilla of evidence supporting the non-moving party and more than some

metaphysical doubt as to the material facts.  Id. at 252; see also Matsushita Elec. Indus. Co. v.

Mem'l Hosp., 192 F.3d 378, 387 (3d Cir. 1999).

## III.    DISCUSSION[19]

### A.    SK's Motion for Summary Judgment

SK moves for summary judgment (Doc. No. 153), on the basis that it was Plaintiff's

"employer" at the time of the incident and, as such, is immune from liability by operation of

Pennsylvania's workers' compensation statute (Doc. No. 154 at 2).

### 1.    Legal Standard Applicable to a Determination of Employer Status for Purposes of the Pennsylvania Workers' Compensation Act

The Pennsylvania Workers' Compensation Act ("PWCA") states, in pertinent part, that

"[t]he liability of an employer . . . shall be exclusive and in place of any and all other liability to

such employs . . . or anyone otherwise entitled to damages in any section at law or otherwise."

See 77 P.S. § 481(a) (setting forth the PWCA's exclusivity provision).  Under the PWCA, an

"employer" is "synonymous with master" and includes, inter alia, "natural persons, partnerships,

joint-stock companies, [and] corporations for profit."  See id. § 21.  Because "the Act does not

---

[19] Because SK and CHI move for summary judgment on different grounds, the Court discusses
each motion separately herein.

specifically define employer, Pennsylvania courts have held that 'the rules for determining the existence of the relation of employer and employee . . . are the same as those at common law for ascertaining the relation of master and servant." Kiehl v. Action Mfg. Co., 535 A.2d 571, 573 (Pa. 1987) (quoting Harris v. Seiavitch, 9 A.2d 375, 376 (Pa. 1939)). A court's determination of whether an employer-employee relationship exists is a fact-based inquiry. See, e.g., Grimsley v. Manitowoc Co., Inc., 675 F. App'x 118, 120 (3d Cir. 2017) (citing JFC Temps, Inc. v. W.C.A.B., 680 A.2d 862, 864 (Pa. 1996)) ("Under Pennsylvania law, the employment relationship is fact-intensive . . . .").

As it pertains to "two corporations, one of which is a wholly-owned subsidiary of the other . . . the problem of determining the question of control can properly be resolved only by a consideration of the functions performed by every interested party – each corporation and the injured employee – in addition to other indicia of control." See Mohan v. Publicker Indus., Inc., 222 A.2d 876, 593-94 (Pa. 1966). "Indeed, there are employees working for corporations where control is constantly changing as the result of merger [or] consolidation." Id. at 594. The Supreme Court of Pennsylvania has instructed that, in such situations:

> the courts must analyze the issue of control in terms of function in order to determine for which corporation an employee in reality works. In other words, where there is established a parent-subsidiary relationship between corporations operating as separate entities and engaged in the performance of different functions, the proper manner by which the question of which corporation has the right of control over a certain employee should be determined is to focus on the functions performed by each corporation and by the employee. If the corporate functions are distinct and in the performance of his duties, the employee is shown to have acted in furtherance of the functions of only one, or essentially one of the corporations, then that corporation will be deemed his employer. Where the business personality of a corporate entity spills over into a related corporation, or over into a wholly-owned subsidiary with an inter-company management relationship, the lines of control are apt to become confused . . . .

*Id.* The Third Circuit has recognized that the analysis articulated in <u>Mohan</u> entails two steps: (1) a "functional" analysis, and (2) if the functional analysis proves inconclusive, an examination of "other indicia of control." <u>See</u> <u>Grimsley</u>, 675 F. App'x 118 at 120. Moreover, this analysis is not limited strictly to a court's determination of whether a parent corporation or its subsidiary is considered an employer, but rather, may also be used with respect to "two affiliated corporations." <u>See</u> <u>Joyce v. Super Fresh Food Mkts., Inc.</u>, 815 F.2d 943, 946 (3d Cir. 1987).

Under Pennsylvania law, to determine whether an entity "possesses the right to control an employee," a court must examine certain factors, including: "which party has the right to fire . . . which party has the obligation to pay wages, which party supplies the employee with the tools of her job . . . and to which party the employee normally reports." <u>See</u> <u>id.</u> at 947 (citations omitted). "In deciding whether [an entity] was the employer at the time of the [incident] 'any discrepancies in the facts would be for a jury to resolve; however, whether the facts as they are determined to exist constitute an employment relationship is strictly a question of law.'" <u>Id.</u> (quoting <u>English v. Lehigh Cty. Auth.</u>, 428 A.2d 1343, 1348 (Pa. Super. Ct. 1981)).

### 2. Arguments of the Parties

#### i. SK's Arguments in Support of Summary Judgment

SK maintains that it is Plaintiff's employer and, therefore, immune from liability in negligence pursuant to the PWCA. According to SK, "Plaintiff's day-to-day job functions remained unchanged from his date of hire through the subject accident." (Doc. No. 154 at 7.) To that end, SK relies on the following factual assertions: (1) that Plaintiff accepted employment with SK approximately four months before the CHI acquisition; (2) that Plaintiff operated in accordance with SK's BOG's and SOP's; (3) that Plaintiff "received training specific to the SK operations"; (4) that Plaintiff completed "SK daily inspection sheets" and "was required to

complete a checklist, on an SK form, of his inspection"; and (5) that Plaintiff "did not undergo any new or additional [m]aterial [h]andler training sponsored by CHESI in January 2014, when Plaintiff contends he became a CHESI employee." (Id. at 7-9.)[20]

SK also argues that "Plaintiff's daily job duties furthered the operation of SK's business endeavors." (Id. at 12.) SK maintains that its "business is distinct and separate from CHESI's" and that "the daily job duties [Plaintiff] completed at the Return and Fill were related to the servicing of parts washers and handling of solvents from SK customers, a line of business that is unique to SK branches[,]" while "CHESI operates hazardous waste incinerators and wastewater treatment plants, and also provides support for field service operations such as oil exploration." (Id.) SK additionally states that the branch was owned by SK, and that "[w]hen the SK branch was closed in 2014 after the incident, the closure documents designated, and were sent to, SK, not CHESI or CHI, as the facility owner." (Id.) SK also refers to Plaintiff's "written job description as a [m]aterial [h]andler," which "was developed by SK and was a job classification unique to SK," while CHESI did not have such a position. (Id.) According to SK, Plaintiff's position as a material handler involved dealing with a solvent that "was made, developed and distributed by SK to SK customers." (Id. at 13.) SK posits that such facts demonstrate that SK maintained control of, or possessed the right to exercise control over, Plaintiff's employment activities, and that these activities "furthered the function of SK, not any other entity" for purposes of satisfying the legal standard articulated supra. (Id.)

ii.     **Plaintiff's Arguments in Opposition to Summary Judgment**

---

[20] In addition, SK points to Plaintiff's use of an SK employee handbook and SK e-mail address (id. at 9), as well as his use of clothing that included the insignia of SK, rather than that of CHI (id. at 10). Further, SK argues that in the course of his employment, Plaintiff reported to SK's branch manager on a daily basis; used a drum washer/dumpster "created from a proprietary SK design" each day; used a torpedo heater in the incident that was "purchased under SK's account"; and "took orders from" SK's branch manager. (Id. at 11.)

In opposition, Plaintiff maintains that SK is not entitled to immunity from suit under the PWCA because his employer at the time of the incident was CHESI. (Doc. No. 164 at 1.) Initially, Plaintiff argues that: (1) prior to the incident, he became the employee of CHESI following the acquisition; (2) CHESI's "acceptance and payment of [his] worker's compensation claim" demonstrates that CHESI was his employer; and (3) a severance agreement and other legally significant documents provided to Plaintiff following the incident indicate that CHESI acted as his employer. (Id. at 2-8.) As to the purported change in his employment prior to the incident, Plaintiff states that several facts show that CHESI became his employer as a result of the acquisition in 2012. (Id. at 3.) Specifically, he states that following the acquisition, he and his co-workers were informed through multiple notifications that they would be employees of "Clean Harbors." (Id. at 3.)[21] Plaintiff also refers to his paychecks, which he states "were issued by CHESI," a departure from former practices whereby SK "paid Plaintiff's wages and withheld taxes" prior to 2014 (id. at 4), and that his "bank records confirm that the payor of his wages changed from [SK] to CHESI with the first payment of wages after January 1, 2014" (id.).

In addition, Plaintiff points to the "acceptance and payment" of his workers' compensation claim by CHESI, stating that the third-party administrator for CHESI's workers' compensation claims "reaffirmed identification of [his] employer as 'Clean Harbors'" in multiple instances in regard to the processing of his workers' compensation claim. (Id. at 5.)[22] Plaintiff

---

[21] According to Plaintiff, such communications consisted of: the issuance of a Clean Harbors "Employee ID Number"; instructions for accessing payroll information; e-mails that referred to the recipients as "[e]ligible [e]mployee[s]"; an invitation to participate in a stock purchase plan for employees; and a notification that Plaintiff's "401K Retirement Plan was merged into and transferred to Clean Harbors effective January 1, 2014." (Doc. No. 164 at 3.)

[22] Plaintiff asserts that "CHESI's acceptance of liability is therefore binding and enforceable," stating that "[i]t is also undisputed that CHESI subsequently paid the compensation benefits required by the [PWCA]" and CHESI "litigated as the 'employer' when disputes arose regarding the payment of benefits." (Doc. No. 164 at 10.)

also cites the third-party administrator's references to "Clean Harbors Environmental Services" as his "employer" in certain notices filed with the Pennsylvania Department of Labor and Industry, Bureau of Workers Compensation, noting that a subsequently-issued, amended notice referred to Plaintiff's employer in this fashion, as well.  (Id. at 6.)

### 3.    Whether SK is Entitled to Summary Judgment

The Court concludes that there is a genuine dispute of material fact as to the identity of Plaintiff's employer for purposes of the PWCA's exclusivity provision, and, therefore, summary judgment in favor of SK is improper.  As noted above, because this action presents the question of "which two affiliated corporations is the employer of a particular employee," the Court "must ask which corporation has the right to control the work to be done by the employee and the manner of performing it."  See Joyce, 815 F.2d at 946 (citing Mohan, 222 A.2d at 879).  Because "two affiliated corporations are involved," however, the Court must "begin [its] inquiry with 'a consideration of the functions performed by every interested party – each corporation and the injured employee[,]'" before examining, if necessary, "other indicia of control."  See id. (quoting Mohan, 222 A.2d at 879).

Under the functional analysis, the Court cannot conclude from the record whether, as a matter of law, CHESI or SK should be considered Plaintiff's employer.  As an initial matter, there is evidence of record suggesting that in his capacity as a material handler, Plaintiff furthered SK's functions of "provid[ing] a broad range of environmental services such as parts cleaning [and] containerized waste services."  (Doc. No. 145-19 at 9.)  A reasonable factfinder, however, could interpret these tasks as furthering the broader functions of the Clean Harbors organization, which describes itself as "a leading provider of environmental, energy[,] and industrial services."  (Id.)  In this regard, the Court agrees with Plaintiff that "[t]here is no clear

'functional' delineation between the operations of [SK] and CHESI" (Doc. No. 164 at 17), and notes that the Third Circuit has recognized the non-dispositive nature of the functional inquiry in similar circumstances.  See Joyce, 815 F.2d at 946-47.[23]  Because the functional analysis is not dispositive, therefore, the Court examines "other indicial of control."

As noted supra, in examining other indicia of control, the Court is concerned primarily with "which party has the right to fire . . . which party has the obligation to pay wages, which party supplies the employee with the tools of her job . . . and to which party the employee normally reports."  See id. at 947.  As it relates to the entity having control over hiring decisions, the Court notes that Plaintiff testified that he was hired in 2012 and provided with an SK employee handbook.  (Doc. No. 140-1 at 25: 1-2, 26: 1-3.)  Further, although Plaintiff admits that Lanphere was his supervisor at the Erie branch (id. at 208: 20-23), Plaintiff was also issued a "Clean Harbors Employee ID . . . for accessing Clean Harbors systems and information only" (Doc. No. 139-3 at 4) and was ostensibly referred to as a Clean Harbors employee in an email notification that he received pertaining to an employee stock purchase plan, which was sent by Clean Harbors (id. at 6).  In this respect, although Plaintiff appears to have reported directly to Lanphere, Plaintiff has identified evidence that Clean Harbors may have provided him with certain means of fulfilling his job responsibilities so as to suggest that it may have been his employer.  See Joyce, 815 F.2d at 947.

---

[23] In Joyce, the Court of Appeals noted that the functional analysis did not "provide a clear-cut answer" as to whether one of two entities – SMS (a wholesaler) and Super Fresh (a grocer) – was the plaintiff's employer when the plaintiff's "job entailed placing SMS products on Super Fresh's shelves . . . [which] may be seen as the last leg in SMS's endeavor to supply Super Fresh with merchandise" and "[t]hus, in performing her job, [the plaintiff] certainly furthered Super Fresh's primary mission," rendering "a functional analysis of little aid" in the Court's inquiry. See Joyce, 815 F.2d at 947.  In light of the relationship between the functions of SK and CHESI, this Court finds Joyce instructive as it pertains to the usefulness of the functional analysis as employed herein.

19

With regard to the payment of wages as an indicium of control, although Plaintiff admits that his W-2 forms for 2014 listed SK as his employer (Doc. No. 140-1 at 236: 4-25, 237: 1), Plaintiff also testified that he received a pay stub in 2014 depicting the Clean Harbors logo (id. at 235: 12-22). Such evidence, however, is not dispositive of the Court's determination as to which entity exercised control over Plaintiff. See, e.g., Joyce, 815 F.2d at 948-49 (reciting relevant facts as to the payment of wages but concluding that the district court's grant of summary judgment was improper because "the district court made various findings concerning key indicia of control that were either erroneous or controverted in the record"). Furthermore, the Court recognizes CHESI's payment of Plaintiff's workers' compensation benefits through a third-party (ESIS) (Doc. No. 147-25 at 16: 11-19), which could permit a factfinder to conclude that CHESI was Plaintiff's employer. See Gallagher v. Pa. Liquor Control Bd., 883 A.2d 550, 558 (Pa. 2005) (stating that "the payment of workers' compensation premiums, while certainly not dispositive, [is] a potentially relevant consideration in determining the identity of the employer"). In light of the relevant evidence of record, and mindful of its obligation to construe all factual disputes in favor of Plaintiff, the non-movant, the Court concludes that there is a genuine dispute of material fact as to the identity of Plaintiff's employer at the time of the incident.[24]

Accordingly, SK's motion for summary judgment will be denied.

B.    **CHI's Motion for Summary Judgment**

---

[24] In Joyce, the Court of Appeals examined "whether there [were] material discrepancies in the record as to the existence vel non of the factors" pertaining to certain indicia of control for purposes of determining the identity of the plaintiff's employer. See id. at 947. Notably, the court concluded that based on such discrepancies in the record, "the district court engaged in fact-finding that is impermissible when ruling on a motion for summary judgment." See id. at 948. This Court concludes that to grant SK's motion for summary judgment would entail such impermissible fact-finding, as this action does not present a case in which "[f]rom these facts alone the identity of the employer is so clear that . . . no jury question is presented with respect thereto." See Mohan, 222 A.2d at 878.

CHI moves for summary judgment (Doc. No. 155), on the basis that it did not undertake a duty "to render services for the protection of Plaintiff" in his capacity as a material handler and, therefore, cannot be held liable to Plaintiff in negligence (Doc. No. 156 at 1-2).

**1.    Legal Standard Applicable to Negligence Actions and Liability Under the Restatement (Second) of Torts**

"The mere fact that an accident occurred does not give rise to an inference that the injured person was the victim of negligence." Estate of Swift v. Ne. Hosp. of Phila., 690 A.2d 719, 722 (Pa. Super. Ct. 1997) (citing McDonald v. Aliquippa Hosp., 606 A.2d 1218, 1220 (Pa. Super. Ct. 1992)). Pennsylvania law, rather, "places the burden on the plaintiff to establish the existence of negligence on the part of the defendant by proving four elements: (1) a duty or obligation recognized by law; (2) a breach of that duty; (3) a causal connection between the conduct and the resulting injury; and (4) actual damages." Id. (citing Pittsburgh Nat'l Bank v. Perr, 637 A.2d 334, 336 (Pa. Super. Ct. 1994)). "Thus, establishing a breach of a legal duty is a condition precedent to a finding of negligence." Id. (citing Shaw v. Kirschbaum, 653 A.2d 12, 15 (Pa. Super. Ct. 1994)). Further, Pennsylvania law embodies the principles of Sections 323 and 324A of the Second Restatement of Torts. See, e.g., Patentas v. United States, 687 F.2d 707, 716 n.10 (3d Cir. 1982) (commenting that Sections 323 and 324A "are part of Pennsylvania law" (citing Blessing v. United States, 447 F. Supp. 1160, 1187-88 (E.D. Pa. 1978)). Sections 323 and 324A pertain to a party's negligent undertaking to render services and a party's liability to a third person for the negligent performance of such an undertaking, respectively. See Restatement (Second) of Torts §§ 323, 324A (Am. Law. Inst. 1965).[25] Section 323 of the Restatement states that:

---

[25] The Court refers to Sections 323 and 324A of the Restatement (Second) of Torts as the "Restatement" herein.

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

> (a) his failure to exercise such care increases the risk of such harm, or
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Id. § 323.

In addition, Section 324A of the Restatement provides that:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Id. § 324A.

Sections 323 and 324A embody Pennsylvania's "good samaritan rule," which mandates that "a person is 'liable to another for breach of a duty voluntarily assumed by affirmative conduct, even when that assumption of duty is gratuitous.'"  See Moyer Packing Co. v. United States, 567 F. Supp. 2d 737, 751 (E.D. Pa. 2008) (quoting Patentas, 687 F.2d at 713-14).  The "basic precept" of the rule is that the "duty is measured by the undertaking."  See id. (citing Blessing, 447 F. Supp. at 1187; Patentas, 687 F.2d at 716).  Therefore, "[t]he foundation of the good samaritan rule is that the defendant specifically has undertaken to perform the task that he or she is charged with having performed negligently."  See Patentas, 687 F.2d at 716. Pennsylvania courts have "long recognized that the determination of whether a defendant exercised reasonable care in the performance of a duty . . . is a question for the jury."  See

Wilson v. PECO Energy Co., 61 A.3d 229, 233 (Pa. Super. Ct. 2012) (citing Feeney v. Disston Manor Pers. Care Home, Inc., 849 A.2d 590, 596 (Pa. Super. Ct. 2004)).

### 2. Arguments of the Parties

#### i. CHI's Arguments in Support of Summary Judgment

According to CHI, "even if Plaintiff is able to establish that CHI exercised some control over operations at SK, any undertaking related to general operations does not establish that CHI undertook[] a specific task or service for the protection of Plaintiff where, as here, Plaintiff intentionally placed an open flame torpedo heater, purchased by SK, within feet of the SK drum washer and combustible solvent in the Return & Fill area of the SK branch." (Doc. No. 156 at 8.) CHI asserts that the relevant evidence of record establishes that it "exercised no control and/or undertook any duty to manage and/or otherwise control the work of a [m]aterial [h]andler who was employed by SK, a CHI operating subsidiary company." (Id. at 9.) Citing the relevant safety policies employed by CHESI and SK (id. at 9-10), CHI states that the "broad, agency-driven CHESI and SK policies" do not "establish[] that CHI undertook a specific service or task to provide for Plaintiff's safety in his use of the SK drum washer and torpedo heater provided by SK at the SK branch" (id. at 10-11). According to CHI, "the harmonization/integration of the CHESI and SK policies and procedures [following the acquisition] was undertaken with the goal of complying with agency standards," and "[t]he policies that were reviewed and compared during that process were not specific to the job of a [m]aterial [h]andler or fire safety in the Return & Fill." (Id. at 12.) CHI also maintains that it is undisputed that neither CHI nor CHESI conducted inspections of Plaintiff's workplace. (Id. at 14.)

As it relates to the Safety Steering Committee, CHI states that the committee did not discuss the specific responsibilities of a material handler, and also argues that "[o]verseeing

requirements for individual jobs was the responsibility of the individual business entities, such as SK" which meant that "CHI did not undertake any separate duty to [Plaintiff] by way of the Safety Steering Committee that would impute liability to the parent company." (Id. at 14.) Further, CHI states that any safety alerts referenced by Plaintiff "were prepared and circulated by employees of CHESI, not CHI," and that the alerts "communicated safety tips and practices, none of which pertain to [Plaintiff's] operation of the drum washer or torpedo heater." (Id. at 15.) Lastly, CHI notes that the safety alert issued by CHESI following the incident "is nothing more than a post-incident reaction and merely demonstrates an ability to influence safety," while SK also "issued its own separate [s]afety [a]lert concerning torpedo heater devices, promulgated its own BOG addressing torpedo haters, and created a variance request that SK branches alone could complete for purposes of requesting a variation in the new safety policy." (Id.) According to CHI, such evidence is demonstrative of "[l]oosely articulated safety goals" that "do not rise to the level of undertaking a duty that allegedly resulted in [Plaintiff's] injuries." (Id. at 16.)

CHI also argues that Plaintiff is unable to establish that it undertook a specific task that was performed negligently so as to increase any risk of harm to Plaintiff. (Id.) Specifically, CHI states that "[e]ven assuming the harmonization is an 'undertaking' under the Restatement . . . and even assuming that the use of a heater was known by CHI or CHESI, none of the policies and procedures that were reviewed during the harmonization increased the risk of harm to Plaintiff." (Id.) (footnote omitted). According to CHI, "Plaintiff cannot establish that CHI undertook efforts to modify or revise the BOGs and SOPs applicable to SK Branch operations," and because the good samaritan rule dictates that a failure to exercise reasonable care cannot exist "in the absence of an action," any argument by Plaintiff that CHI "fail[ed] to 'do more' to ensure [his] safety as a [m]aterial [h]andler" is meritless because "inaction by itself cannot create

liability" for purposes of the good samaritan rule. (Id. at 17) (citing Garlick v. Trans Tech Logistics, Inc., 2014 WL 11395241, at *5 (M.D. Pa. Sept. 29, 2014)).[26]  In essence, CHI maintains that: it "exercised no control over the SK [b]ranch operations or the day-to-day operations of the [m]aterial [h]andler at SK [b]ranches"; no CHI employees undertook any affirmative actions or implemented any affirmative policies "so as to establish a duty undertaken by CHI pursuant to Sections 323 and 324A"; and no evidence of record suggests "that CHI undertook any such duty to inspect and/or implement any of CHESI's policies and procedures pertaining to the duties of a [m]aterial [h]andler at an SK [b]ranch because there are no such policies or procedures." (Id. at 19-20.)

##   ii.    Plaintiff's Arguments Against Summary Judgment

In opposition, Plaintiff asserts that summary judgment is improper because "one company's continued involvement in safety does not insulate a third party from liability under Section 324A," and "[m]oreover, if the BOGs were intended to be safety rules, they are inadequate," for CH's reviewing the BOGs and "approv[ing] their continued use" constitute "a potential basis of liability, and not a reason to grant summary judgment." (Doc. No. 163 at 15.) Plaintiff maintains that evidence of record shows "that CHI undertook to manage safety at its SK subsidiary in multiple respects," including: (1)  undertaking the management of "safety meetings, and send[ing] [s]afety [a]lerts to the Erie plant, including one for portable heaters"; (2) issuing a "Safety Commitment Policy" for purposes of managing safety "at its subsidiary"; (3) undertaking "to manage safety at SK through the Clean Harbors Safety Steering Committee";

---

[26] As to the Commitment Policy and Safety Steering Committee, CHI states that "[a] parent company cannot be expected to anticipate every danger to every employee of its subsidiary, and there is no obligation under the law to do so," and although Plaintiff may "contend that CHI's failure to identify the use of a torpedo heater as a potential danger increased the risk of harm to Plaintiff . . . a failure to do something is not an undertaking under Sections 323 and 324A of the Restatement."  (Id. at 17.)

(4) undertaking "to direct and supervise SK's safety personnel"; (5) "review[ing] existing SK safety policies" pertaining to "safety at the Erie plant"; (6) undertaking "to provide employee safety training"; and (7) undertaking "to provide management safety training." (Id. at 15-28) (internal quotation marks omitted).

Additionally, Plaintiff argues that "CHI's control of the safety budget, personnel, policies, and training at the former SK facilities create[d] a duty of care to those facilities['] employees, including [] [P]laintiff." (Id. at 30.) Plaintiff maintains that certain evidence "contradicts CHI's claim that it acts only as a 'holding company' with no employees," as McKim, the chairman and CEO of CHI, along with James Rutledge, whom Plaintiff maintains was the President and CFO of SK as of September, 2013 (Doc. No. 165 ¶ 69), "directly controlled the . . . Safety Steering Committee and the Safety Department," and it is "well-settled that a corporation is liable for the acts of its officers [and] executives" (Doc. No. 163 at 30-31) (citing Donsco, Inc. v. Casper Corp., 587 F.2d 602 (3d Cir. 1978)). In addition, according to Plaintiff, "[t]here is evidence that CHI's conduct not only increased the risk of harm [to Plaintiff], but directly caused the fire/explosion" in that "Clean Harbors sent a flawed and dangerous [s]afety [a]lert containing safety rules for portable heaters, and the Erie manager testified that he read and relied on this information[,]" which "supports a finding that CHI created an increased risk of harm at the Erie plant." (Id. at 34-35) (internal quotation marks omitted).

### 3.  Whether CHI is Entitled to Summary Judgment

CHI is not entitled to summary judgment as to Plaintiff's claim against it, as the relevant evidence of record establishes a genuine dispute of material fact regarding whether CHI undertook a duty as to Plaintiff's safety and whether CHI performed such an undertaking

negligently. As an initial matter, the record contains ample evidence from which a reasonable factfinder could infer, under the standard articulated supra, that CHI undertook a duty to manage safety in such a way that it owed a duty to Plaintiff for purposes of the Restatement. Plaintiff has pointed to evidence that CHI explicitly stated that it intended to oversee safety within its company, including the safety of those affiliated with SK, as demonstrated by, inter alia: (1) a 2013 announcement from McKim stating that CHI's "Health and Safety team members will report" to its "Health and Safety organization[,]" including "the team from [SK]" (Doc. No. 140-49); (2) deposition testimony from John Curl, who stated that he "work[s] for Clean Harbors Environmental Services" and that his employment "involve[d] providing safety training for workers who work in facilities" (Doc. No. 143-1 at 10: 16-18, 11: 19-21); and (3) an email reference to "the full integration and consolidation of the Clean Harbors and Safety Kleen Health & Safety Policies and Standards" in 2013, following the acquisition (Doc. No. 142-47 at 1). Evidence of this undertaking is further supported by the formation of the Safety Steering Committee, which promulgated safety-related policies directed at facilities, including SK's Erie branch. (Doc. Nos. 140-41 at 48: 14-24, 142-4 at 36: 21-24, 164-1 at 129: 8-12.)

The record also suggests that CHI undertook a duty regarding fire safety specifically related to the use of space heaters, including the type of heater involved in the incident. Plaintiff testified that he was aware of previous instances in which such a heater was used (Doc. No. 140-1 at 103: 16-20), including his observation that he saw Lanphere employ the heater so as to "direct[] the heat to a certain direction to thaw pipes" (id. at 110: 14-15), as well as an inspection form dated January 30, 2014 stating that "[a] torpedo heater had been used in [the Return and Fill] area for at least 8 to 10 years" (Doc. No. 140-35 at 2). Furthermore, the committee communicated directly with Lanphere, SK's Erie branch manager (Doc. No. 164-1 at 128: 11-

16), and developed the "Safety Starts With Me: Live It 3-6-5 Campaign[,]" which it advertised to all employees (id. at 129: 6-12, Doc. No. 144-1 at 99: 7-13).  The record also demonstrates that the management of the relevant safety policies was intended to apply to Clean Harbors' subsidiaries, as Michael McDonald, the assistant secretary of CHESI, answered in the affirmative when asked in his deposition whether such management would "include the subsidiaries."  (Doc. No. 145-2 at 87: 16-21.)

Additionally, evidence as to the committee meetings and safety alerts provides a basis from which a reasonable factfinder could conclude that CHI satisfied the requisite undertaking for purposes of the Restatement.  Certain notes from the committee's meetings establish its intent to pursue a "broader, more intense, longer, more focused training on [s]afety" (Doc. No. 140-54 at 2), as well as a specific focus on creating safety alerts as to space heaters, which was noted in regard to a February 11, 2013 meeting chaired by Lanphere (Doc. No. 141-36 at 1).  Further, CHI issued safety alerts that addressed the use of space heaters and the specific danger they may pose when used in close proximity to flammable areas, having issued such an alert almost one year prior to the incident (id.), and shortly after the incident involving Plaintiff (Doc. No. 144-15).[27]  Notably, the alert issued in February 2013 – almost one year before the incident occurred – stated, inter alia, that such heaters "may cause nearby combustible material to ignite" and noted the importance of keeping these haters "at least 3 feet away from anything that can burn."[28] (Doc. No. 141-36 at 4-5.)

---

[27] This undertaking is made even more apparent by the committee's meeting notes, subsequent to the incident, in February of 2014, which state that the committee "[d]iscussed the [SK] fire and Alan McKim requested that gas fired heaters are not to be used, and we do not want space heaters in our buildings, and suggested a ban on space heaters."  (Doc. No. 140-64 at 1.)

[28] In addition, Lanphere testified that he received the February 2013 safety alert as to space heaters, adding that the "probably read it at the meeting."  (Doc. No. 141-37 at 84: 1-16.)

In light of the aforementioned evidence of record, the Court concludes that, for purposes of the relevant summary judgment analysis, a reasonable factfinder could infer that CHI undertook to manage the safety of Plaintiff in his capacity as a material handler in accordance with the Restatement. Further, the Court rejects CHI's argument that its safety-related policies were so broad or aspirational as to render it devoid of any undertaking with respect to the operations of SK branches, including those operations as they related to Plaintiff, for "[i]t would be disingenuous to conclude, as [CHI] suggests, that the performance of [such safety-related measures] would not foreseeably give rise to concerns regarding the safety and protection" of employees such as Plaintiff. See Santillo v. Chambersburg Eng'g Co., 603 F. Supp. 211, 214 (E.D. Pa. 1985) (citing Cantwell v. Allegheny Cty., 483 A.2d 1350, 1353-54 (Pa. 1984)). Additionally, to the extent CHI asserts that it could not have undertaken such a duty because its undertaking did not contemplate Plaintiff's specific use of a space heater in his employment as a material handler, or that such safety-related undertakings rested only with SK, the Court rejects any such argument because it appears that such a duty is analogous to one that "could never, in reality, be fully delegated and assumed by another party [because] it is too broad." See id. at 215 (noting that "[t]he touchstone of § 324A is that the defendant has undertaken some service for another party which is of a nature to give rise to a duty on the part of the actor to use reasonable care" and concluding that "[t]o accept the interpretation . . . urged by [the defendant] would be tantamount to holding that liability for an on-the-job injury could never be imposed on a non-employer based on § 324A").

Moreover, the Court concludes that Plaintiff has pointed to sufficient evidence that CHI's performance of said undertaking either increased the risk of harm to him, or that he relied upon this undertaking in such a way that caused him to experience the harm of which he complains.

See Restatement (Second) of Torts §§ 323, 324A (Am. Law. Inst. 1965). Specifically, a reasonable factfinder could conclude that the above standard has been satisfied based on evidence that almost one year prior to the incident, a safety alert was issued as to space heaters, of which Lanphere was aware and had also discussed with others involved in developing and implementing safety-related policies. (Doc. No. 141-37 at 83: 3-5.) In addition, Hooper had observed Lanphere using the space heater for the purpose of thawing pipes (Doc. No. 140-1 at 110: 14-15), and the use of such heaters in the Return and Fill area in prior years had been documented (Doc. No. 140-35 at 2). The trier of fact, therefore, could reasonably infer that as a result of the prior use of these heaters in the facility, CHI failed to exercise reasonable care to prevent harm to employees using such heaters in a dangerous fashion, and/or that Plaintiff relied on CHI's undertaking of certain safety obligations in that he believed it was an acceptable and safe practice to use them as he did at the time of the incident. Accordingly, because a reasonable factfinder could infer that CHI satisfied the undertaking requirement for purposes of liability under the Restatement and performed such an undertaking negligently, CHI's motion for summary judgment will be denied.[29]

## IV. CONCLUSION

Based on the foregoing, Defendants' motions (Doc. Nos. 153, 155), will be denied. An appropriate Order follows.

s/Yvette Kane
Yvette Kane, District Judge
United States District Court
Western District of Pennsylvania
*Sitting by designation*

---

[29] Because the Court concludes that CHI's motion for summary judgment should be denied on the basis of the applicable analysis under the Restatement, the Court need not address the issue raised by the parties of whether CHI would be liable, absent such an undertaking, based on a theory of vicarious liability as a result of the parent-subsidiary relationship between CHI and SK.